241 P.2d 333

**NELMS v. MILLER et al.**
No. 5424.

Supreme Court of New Mexico.
Jan. 8, 1952.
Rehearing Denied March 20, 1952.

Harry L. Bigbee, Donnon Stephenson, Santa Fe, for appellant.

Dudley Cornell, Albuquerque, Hervey, Dow & Hinkle, Roswell, Manuel A. Sanchez, Santa Fe, Turner, Atwood, White, McLane & Francis, Dallas, Tex., for appellee.

COMPTON, Justice.

Appellee, Nealy L. Nelms, filed suit against appellant, A. D. Miller, to quiet title to certain lands situated in Rio Arriba County. Appellant moved to bring in as additional parties, appellees, Dudley Cornell, Mary Lee Cornell, Eva Nelms, Jerry Curtis, Magnolia Petroleum Company, and Delhi Oil Corporation, on the ground that they claimed some rights in the premises in question, hence, necessary parties for a final determination of appellant's rights. The motion being granted, appellant filed a general denial of Nealy L. Nelms' ownership, a counterclaim against Nelms, and a cross claim against those appellees brought in as additional defendants, alleging possession, right of possession, and ownership of the premises involved and praying that his title be quieted. Eva Nelms, wife of Nealy L. Nelms, answered the cross claim, denying appellant's claim and further alleging that Magnolia Petroleum Company, Delhi Oil Corporation, and Jerry Curtis, were the owners of oil and gas leases or royalty interest in the premises. Nealy L. Nelms answered, making the same contentions as made by his wife with the further allegation that appellant was occupying the land as his tenant.

Appellee Delhi Oil Corporation answered the cross claim, affirmatively pleading that Nelms had given an oil and gas lease to Dudley Cornell on a portion of the land; that Magnolia Petroleum Company had acquired the lease from Cornells and that it had thereafter acquired an undivided one-half interest in the lease from Magnolia Petroleum Company. It further pleaded that Magnolia Petroleum Company had ac-

quired additional oil and gas leases for prospecting, mining and development, of approximately 28,500 acres surrounding, and in close proximity to, the lands involved; that said land was suitable for oil and gas prospecting and that the same was unproven at the time of acquirement by Magnolia Petroleum Company. It further pleaded that under an agreement with Magnolia Petroleum Company, Delhi Oil Corporation was to carry on drilling in the area and as a consideration therefor, had acquired one half of the interest held by Magnolia Petroleum Company; that Delhi Oil Corporation, in the summer of 1949, drilled and completed a well on said block to a depth of approximately 7800 feet, at an expense in excess of $100,000. Delhi Oil Corporation specifically pleads that it was a bona fide purchaser for value.

Magnolia Petroleum Company, denied appellant's claim and affirmatively pleaded that Nelms had leased a portion of the land for oil and gas operations to Dudley Cornell, from whom it had acquired the lease. It also pleaded that appellant claims under a contract dated May 4, 1937, and that appellant acquired no title thereby; that the document was only a purchase contract and the purchase price not having been paid, the same had been forfeited. It also pleaded that it was a bona fide purchaser for value without notice.

Curtis answered, making the same contentions as Magnolia Petroleum Company except he set up a mineral deed conveying an undivided three-fourths interest in the minerals under the land in question, from Nelms to Dudley Cornell, and the subsequent delivery of a mineral deed from Cornell to him.

Cross appellees, Cornell, filed a disclaimer.

On May 4, 1937, appellant and Nealy L. Nelms executed the contract in question, which reads:

"State of New Mexico:
County of Rio Arriba:

"This Agreement made and entered into this 4th day of May, 1937 by and between Nealy L. Nelms, and Eva Nelms of the first part, A. D. Miller of the second part and the United States Bank of Grant Junction, Colorado party of the third part,

"Witnesseth: That whereas the party of the first part has sold to the party of the second part one parcel of land containing 640 acres of the following description: (Here follows description.)

"Consideration $2500.00 This is to be paid as following, Cash $100.00 All other payments are to be paid annually as following: $300.00 each year on March 1st with 5% interest for a period of eight years. Now Thereof, if the party of the second part, or anyone for him shall on or before the due dates of said promissory notes, well and truly repay the said sum of $2500.00 with interest thereon at the rate of 5% per annum

from maturity of said promissory notes then the party of the third part shall turn over and deliver the said deeds to the second party in fullfillment of this agreement, but if the said party of the second part shall fail or refuse to pay the said sum of $2500 as agreed, or the interest thereon, then the said party of the third part shall redeliver to the party of the first part the said deeds and this agreement shall be null and void.

"It is also made a part of this agreement that the party of the second part shall pay all taxes which may be levied on the said parcel of land beginning with the calender year 1937.

"Witnesses:

F. J. Hill

J. F. Lamb

"/s/ Nealy L. Nelms

/s/ Eva Nelms

Parties of the first part.

/s/ A. D. Miller

Parties of the second part.

United States Bank of Grand Junction, Grand Junction, Colorado

/s/ O. D. Eli, Cashier

Parties of the third part."

At the time the contract was signed, appellant also executed eight promissory notes in the sum of $300 each, payable annually on March 1, 1938, to 1945 inclusive. The notes, the contract, and deed were then sent to the escrow agent at Grand Junction, Colorado. In January, 1947, the bank delivered them to appellant who retained them until the date of trial. Due to financial difficulties, appellant was unable to make payments when due. It is conceded that the annual due date on the notes was extended twice, and that the interest was paid in March, 1938.

Whether there was a forfeiture of the contract is the basic question. Appellees Nelms contend that it has been forfeited. Appellant contends that it has not.

The cause was tried to the court without a jury, at the conclusion of which, the court made the following findings of fact:

5. That the plaintiff Nelms extended in writing, the time for the payment of the first two notes, but granted no further extensions to the defendant Miller.

6. That the defendant Miller, at all times material hereto, and from on or about May 4th, 1937, until the present time, has been in open, notorious possession of the lands and farmed the same, and in addition, has received all of the income therefrom.

7. That during all of the period involved, whatever taxes were assessed against the property involved, were assessed in the name of the defendant Miller, and the taxes paid thereon in part by Soldiers exemption and in part in cash.

8. That the defendant Miller improved the property to some extent, in that addi-

tional lands were cleared, and a house constructed, principally out of materials obtained from another house existing on the premises prior to the defendant Miller's possession thereof.

9. That the Court further finds that there was considerable correspondence carried on between the plaintiff, Nealy L. Nelms and the defendant, A. D. Miller, with respect to the property in question, but that the same is inconsistent with the contention of the defendant, A. D. Miller, that the contract of May 4, 1937, was extended from time to time, or that it constituted a mortgage or that the defendant, A. D. Miller, had any equity in and to said property.

14. That on February 22, 1947, the said plaintiff, Nealy L. Nelms joined by his wife, Eva M. Nelms, for a valuable consideration executed and delivered to Dudley Cornell a certain oil, gas and mineral lease covering the said S½N½, Sec. 17, Twp. 24 N., Rge. 2 W., giving and granting to the said Dudley Cornell the exclusive right to prospect for, explore, drill, mine and produce oil, gas and all other minerals from said lands, and being the lease described in the Answers of the Magnolia Petroleum Company and Delhi Oil Corporation.

15. That on March 24, 1947, said lessee, Dudley Cornell joined by his wife, Mary Lee Cornell, made, executed and delivered an assignment of said oil and gas lease to Magnolia Petroleum Company and that thereafter the Magnolia Petroleum Company assigned an undivided one-half interest in and to said oil and gas lease covering said lands to the cross defendant, Delhi Oil Corporation.

17. That on May 11, 1949, the said Nealy L. Nelms and Eva M. Nelms, his wife, executed and delivered to Dudley Cornell a certain mineral deed covering an undivided three-fourths interest in and to all of the oil, gas and other minerals in and under and that may be produced from the said S½N½, N½S½, Sec. 17, Twp. 24 N., Rge. 2 W., N.M.P.M.; said mineral deed being made subject to the oil and gas lease of February 22, 1947, made by Nealy L. Nelms and wife, to the said Dudley Cornell, covering said land.

18. That on May 25, 1949, the said Dudley Cornell joined by his wife, Mary Lee Cornell, executed and delivered a mineral deed to the cross defendant, Jerry Curtis, covering an undivided three-fourths interest in and to all of the oil, gas and other minerals in and under and that may be produced from the said S½N½, N½S½, Sec. 17, Twp. 24 N., Rge. 2 W., and being the entire mineral interest covered by the deed made by Nelms and wife to Dudley Cornell on May 11, 1949.

19. That said oil and gas lease and undivided three-fourths interest in and to all of the oil, gas and other minerals acquired by said defendants were acquired for valu-

able considerations in good faith and without knowledge of any adverse claim of the defendant, A. D. Miller.

The court then concluded:

(1.) That the Purchase Agreement made and entered into by and between the plaintiff, Nealy L. Nelms and defendant, A. D. Miller, on May, 4, 1937, was an executory contract and did not convey any rights, title or interest in and to the property covered by the same to the defendant, A. D. Miller, and that said agreement did not constitute a mortgage.

(2.) That the defendant, A. D. Miller, forfeited all rights under the terms of the executory purchase contract of May 4, 1937, made and entered into by and between Nealy L. Nelms and the said A. D. Miller and that the same became null and void upon failure and refusal of the said A. D. Miller to pay the balance of the agreed consideration and that the escrow created in connection with the same was properly terminated by the United States Bank of Grand Junction, redelivering the deed covering the said property to Nealy L. Nelms.

(3.) That the correspondence carried on between the plaintiff, Nealy L. Nelms, and the defendant, A. D. Miller, introduced in evidence in this case, and the action of the parties in connection therewith, did not constitute either a new contract or agreement between the plaintiff and the defendant, A. D. Miller, nor did the same constitute an estoppel or revive, extend, or in any way keep alive the original purchase agreement of May 4, 1937, between said parties, and that the defendant A. D. Miller, had no vested interest, either in law or in equity in and to said property.

(4.) That the payment of such taxes as defendant Miller paid, and the improvements that he made upon the property amounted to no more than reasonable rental therefor for the period involved.

(8.) That on February 22, 1947, and at all times prior thereto, the plaintiff, Nealy L. Nelms, was the owner in fee simple of the S½N½, N½S½, Sec. 17, Twp. 24 N., Rge. 2 W., Rio Arriba County, New Mexico.

(9.) That the Magnolia Petroleum Company and Delhi Oil Corporation are the owners and holders of the oil and gas lease made and entered into on February 22, 1947, between Nealy L. Nelms and wife, Eva M. Nelms, covering S½N½, N½S½, Sec. 17, Twp. 24 N., Rge. 2 W., more particularly described in the Answers of the Magnolia Petroleum Company and Delhi Oil Corporation and that said oil and gas lease is in good standing.

(10.) That the cross defendant, Jerry Curtis, is the owner of an undivided three-fourths interest in and to all of the oil, gas and other minerals in and under and that may be produced from the said S½N½, N½S½, Sec. 17, Twp. 24 N., Rge. 2 W., subject to the oil and gas lease held by

Magnolia Petroleum Company and Delhi Oil Corporation covering said lands.

(11.) That the cross defendants, Magnolia Petroleum Company and Delhi Oil Corporation and Jerry Curtis, acquired said oil and gas leasehold and mineral interests for a valuable consideration in good faith and without notice of any claim of the defendant, A. D. Miller, and that said cross defendants are bona fide purchasers of said interests.

(12.) That the lands involved in this action have been unitized for oil and gas prospecting, mining and development, with other surrounding lands comprising a block of 28,500 acres; and that said lands and said 28,500 acres were unproven at the time of acquirement of the lease dated February 22, 1947, by said Dudley Cornell from the plaintiff, Nealy L. Nelms, and the assignment thereof to defendant Magnolia Petroleum Company and the acquirement of an interest therein by Delhi Oil Corporation; and that in connection with development of said lands for oil and gas prospecting, mining, and development, the cross defendant Delhi Oil Corporation, in the summer of 1949 and prior to the 28th day of October, 1949, drilled and completed a producing well on said area of 28,500 acres to a depth of 7800 feet at an expense of $226,250.00; and that said development and expenditure was made and performed by said Delhi Oil Corporation without knowledge of any adverse claim of the defendant A. D. Miller in and to the lands involved in this action.

The findings are challenged principally on the ground that they are without support in the evidence. There are 81 assignments of error which are argued under the following points:

"Point I

"The document of May 4, 1937 conveyed legal title to the land involved in this action to appellant.

"Point II

"The documents executed May 4, 1937, considered with the surrounding circumstances and the intent of the parties created a security arrangement in the nature of a mortgage or vendor's lien in appellees Nelms, which could be enforced only by foreclosure.

"Point III

"If the transaction of May 4, 1937 between appellant and appellees Nelms merely gave rise to a contract of sale, appellees Nelms would still be required to foreclose their vendors lien or to at least make demand for payment prior to rescinding.

"Point IV

"Even if the Document of May 4, 1937 was only a contract, and if a right to forfeiture ever existed, appellees Nelms have by their actions waived such right and are estopped to assert or enforce it.

"Point V

"Appellees Dudley Cornell, Mary Lee Cornell, Magnolia Petroleum Company, Delhi Oil Corporation and Jerry Curtis are not bona fide purchasers for value of their claimed rights and interests in the land in suit without notice of appellant's claim in and to said lands."

We deem an extensive review of the evidence to be necessary in explanation of our opinion. Much correspondence leading to the making of the contract and concerning the subsequent conduct of the parties was admitted in evidence. The following facts are undisputed:

"Lindrith, New Mex.
March. 27–37

"Mr. Nelms

"Received your letter yesterday. Looked over your place some today and went around the fences. How much of the line fence is yours?

"I understand the place lay*es* 5 forties east & west & 3 forties north & south one forty on the north west outside.

"I think there is something like 150 acres of sage that could be cleared.

"Now I am going to make you the best proposition I possibly can this spring & still be able to clear something like 70 acres & get it into crop.

"I can pay you $100 say as soon as we can get the papers made up, of coa*rs* in case this is sat. with you. this would take care of taxes & expenses of the papers of which I would expect a mortgage deed with notes of each payment as it comes due & a abstract of title with the notes all payable at any time. And I will stand half of the cost of an abstract which should*nt* be much since you are the original homesteader. Then have one note to come due in six months for $150 which would complete the 250 down payment & the next note a year from now & the rest each year for 8 years. That make $500 pa*yed* the first year & I *bli*eve after I pay that much & have done some improving & cleared as much as a 100 of land I can borrow 2000 of this federal money on long terms & pay you out if you so d*i*sired. I possibly (over) pay you the $150 before 6 months as soon as I get my crop in I can take my tractor & clear sage out & make that much but the trouble is them that want sage cleared wants it done on time until*l* fall. If this proposition should suit please let me know at once as it is getting to where we can start farming. I have Lindrith Cordells place rented but there isn't much farm land on it. As ever a friend.

"(Sgd.) A. D. Miller.

"Grand Junction Colo.
Apr. 4–1937

"Dear Mr. Miller—I received your letter of March 27, and believe we can go ahead with the deal. The plan of payments would be a*l*right.

"$100.00 when papers are completed (about May 1st.) 1937

$250.00 after six months—Nov 1st 1937 The remaining $2250.00 in eight equal annual payments payable on or before May 1st each year. Interest on the unpaid part at 5% payable each year. I will pay the past due taxes as soon as I receive the $100.00 or you could pay it yourself out of the $100.00 and send the tax receipts with the balance of the hundred.

"It might be better for you to have the abstract made yourself as you are there and it would be less trouble for you. I would pay half of the abstractors charges.

"However I would like to have a different kind of papers on the deal from those you mentioned. It seems to me it would be better to draw up a contract with you agreeing to make the payments as scheduled above and myself agreeing to convey sound title of the property to you. I would then make up and sign the deed and we would both sign the contract in three copies, you would have one copy—I would have one copy and one copy would remain with the deed. The deed would be placed in escrow with the United States Bank of Grand Junction or any bank you preferred. When the payments were completed the deed would automatically become yours. If the payments were defaulted it would revert to me. In neither case would any legal process be necessary. I have bought on this sort of contract at various times and consider it a very satisfactory way to handle it.

"It has been several years since I left the place but when I left it it had a wire fence along the east line. And on the north and west boundaries the fence was about twenty feet inside my line. All of this belongs with the place. I also had a fence on the south side but it enclosed some land that was not mine and after these years I suppose there is nothing left of it to lay claim to so as far as I know there is nothing on the south side.

"The shape of the place is as you said ¾ mile by 1¼ mile with a 40 acre piece at the northwest. (Description of land follows.)

"If you find that this kind of deal suits you let me know and I will have the papers made out at once.

"Yours very truly,
(Sgd.) Nealy L. Nelms

"Lindrith N. Mex
April. 8–37

"Mr. Nelms

"Letter received & am satisfied with your proposal except one thing I would like changed & I believe you will agree. would like for the payments to come due say on the first Feb or March. I guess you know as well as I that there are years here that there isnt much raised & in case of a crop failure the payments coming due in the fall would work a hardship on me. Where if

they are due in the spring it would give me a chance to make it in the winter month & another thing it would give me a chance to hold over a crop in case price was down at harvest.

"The contract protects you off the costs of foreclosure which is allright. Where a mort*age* deed gives the purchaser a few months grace to dig up a payment but if you will make the date of payment in the spring it will give me the same protection & also protect you against the costs of fore-clos*eur*.

"Now the way I understood you was that $100 down as soon as the papers are made with 8 payments which would be $300 a year with interest at 5%. I would want a clause in the contract that states it can all be pa*yed* at any time which I guess would suit you. I presume the mineral rights if you have them go right with place.

"We are having some good weather here now which is suitable for clearing sage & I have got to make it snappy if I get 70 acres cleared in time for beans. So if every-thing is sat*if*actory with you I wish you would send me a statement of so*n*e sort that would enable me to start clearing & then when you get the papers made out & send them down for my signature I will go to *Terra Amerra* & pay the taxes & send you the balence with the papers (over)

"I guess it is alright to have the papers held at the Grand Junction bank unless the should at a bank in this state if so the

Chama bank would be all right with me. by the way I hear you are a World War Vet. there was a *soldat* in my outfit by the name of Nelms but *dont recolet* his first name. Bat D 127th H.F.A.

"Will close hoping to hear from you soon.
"(Sgd.) Dewey Miller.
"(Registered: April 13, 1937—18¢ Stamps)

"Grand Junction Colo
Apr. 15–1937

"Dear Mr. Miller—I received your letter and will say that it will be alright to make the note with the payments due on March the first each year $300 each time for eight years.

"I think I am going to have a chance to come over there in about two weeks and we can make out the papers then and it will be finished up about as quickly as we could do it by mail. I realize that it is time to begin farming so you can go ahead when-ever you wish without waiting for the pa-pers.

"Sincerely,
"(Sgd.) Nealy L. Nelms
"Lindrith N.Mex.
April 23–37

"Mr. Nelms

"Received your *litter t*ues, & am glad you can come down as it is like you say kind*a* slow by mail & I would prefer talking to writing any time.

"I have started clearing sage expect to have around 80 acres done in the next two weeks.

"Bring your family & figure on camping with us while you are here. We had a light snow last night but the roads are dried up tonite & are in pretty good shape out to *Albeq*.

"Will be seeing you.

"(Sgd.) A. D. Miller

"Grand Junction, Colo.
June 1st 1937

"Dear Mr. Miller—The papers arrived and my copy has been turned over to me.

"Mr. Ela, cashier of the bank, told me that he sent yours to Mr. Hill. He also said he notified you, by the same letter that there would be an escrow fee of $5.00. This was an error on his part. There was a $5.00 charge but I had already told him that I would take care of it when the papers arrived. I did so today so there is no part of this expense to be paid by you. Sorry this happened but is O.K. now.

"Hoping this finds yourself & family well and everything going along smoothly I remain,

"Yours very truly,
(Sgd.) Nealy L. Nelms
"Lindrith N. Mex
Dec. 10–37

"Mr. Nelms

"Dear Sir, in regard to the place it seems in the *langage* of the country that I am blowed up. We had a dry *august* here this year & new ground beans did*nt* do much, some was*nt* worth harvesting & some made a sack & a half, averaged about ¾ of a sack to the acre. Although the old ground done very well as there was some that made as much as 6½ per acre so I am not discouraged with the farming prospects here because I realize if I had of had all old ground I could of come out all right, even this year & they claim that a dry *august* is very unusual. Mr. Hills beans averaged 4 p.a. sacks on a 100 acres.

"Now I am sure up against it this fall & about all I can offer you is that the taxes will be pa*yed*, but I sure would like to try the place another year as I will have about 60 acres of second year land to put to beans & would clear 30 more for a feed crop, more if I can. I will have to dig a well this year also, as I spent about a ⅓ of my time last summer hauling water & will have to do some more fencing. Now Mr. Nelms I believe this is a fair proposition for you considering that some renters here are getting 3 years of crops for clearing & breaking out new ground & it will give me a chance to break out providing we have a fair season & get a fair price next fall.

"Will close hoping this finds you folks al well & all set for a Merry Xmas

"Yours tru*ely*
(Sgd.) Dewey Miller.
"Lindrith N.Mex
Feb 27–38

"Mr. Nelms,

"Am sending you a check for interest less the taxes in this letter. The taxes were 33

& some cents & my army exemption covered them this year & in this state they wont issue a *ricipt* where the full aimount is exempted they just mark it paid on the books. I have got to go to the co. seat as soon as the roads are passable & will get co. treasurer to send you a little note stating the taxes are paid by my exemption. in N.M. Veterans are exempt $2200.

"Would of liked to taken you up on your other proposition but just couldnt raise the money & have any left to farm with.

"As I understand this proposition it will extent the payment one more year making the last note due in 45. We have the ear marks of a good season this year frost has been out for 3 weeks & has been raining & snowing most all of this month.

"Yours truely

(Sgd.) A. D. Miller

"P.S. You spoke of the Hall place going to be for sale this spring believe I can sell it for you if it is for sale if you will advise as to the price & terms.

"(Sgd.) A. D. Miller

"(Registered: Feb. 24, 1938—18¢ Stamps)

"Lindrith N. Mex.

Mar. 25–38

"Mr. Nelms,

"Dear sir sent you a letter with a check in it for $78, about two months past & havent heard from you just wondered if you had goton it alright it was registered. there. has. been some mail that has gone astray here recently. When you write me adress it to Regina in care of G. D. Grigsby, he is the man that bought out Mr. Hill.

"Yours truly

(Sgd.) A. D. Miller

"Lindrith N. Mex.

Jan. 4–39

"Mr. Nelms,

"hope this year finds you folks all well & happy. We are all well. have had a very mild winter so far. I am sort of at your mercy again this year, have done better this year than last, had $74 worth of beans compared to $35 worth in 37—have my seed & feed for this year but no money will have to work out enough for a living, last spring I had to plow out to make enough to buy (over) fuel to plow mine buy seed, & by the time I got to mine is was pretty late fact is it was to late for beans & most of my beans frosted last fall. cleared 20 acres of sage last year but didnt get it planted will clear 20 more this year have about 80 acres cleared now will have 60 for beans & believe can make as much as 4 sack to the acre the 3d. year have found the 1st. & scond years are not so good for beans but will raise fair corn or oats.

"About this tax recipts was over to T. A. yesterday & found they allowed my exemption for 38 but didnt alow it for 37 but think I can get a court order & get it alowed. The Lgion is taking up this recipt buisness & the attorney general says

we are entitel*ed* to a re*ci*pt so guess as soon as the new officials get sett*el*ed can get them. If I ca*nt* get a court order will pay 37 tax. (over)

"Now Mr. Nelms if you will give me another years try I sure will appr*e*iate it to the depth of my heart because I have .put in lots of hard work here & have*nt* yet rec*ev*ed in return half as much as I have spent. I believe if the place was worth $2500 in the raw it will be worth 3000 with 100 acres of sage cleared. I am just getting along at that age where to lo*o*se out now would go pretty hard with me. There is some places here that was sold on a crop payment 1/3 of crop until*l* pa*y*ed for with the buyer paying the taxes have often wished I could of bought a place that wa*s* as it do*nt* work such a hardship on the farmer a dry year or on planting new ground.

"Would like to hear from you as soon as possible so if this is agr*ea*ble would like to get a well dug this winter, tested for water south of the house last summer & hit water at 50 ft. but did*nt* get time to dig it out.

"Yours tru*e*ly
(Sgd.) A. D. Miller
"Lindrith N. Mex.
Jan. 23–39

"Mr. Nelms

"r*i*ceived your letter & sure appreci*a*te your kindness in extending the notes, I

have*nt* got any money right now to pay the interest with but there is going to be some work open up here as soon as the snow goes off (we have a foot of snow yet.) I think I can make enough to pay you in the next 4 months, it is W.P.A. & do*nt* know just how much each man is *alloted* each month. but think it is around $40. If I can get some plowing or sage clearing to do can pay you sooner. Money is sure scarce here now seems as *tough* there is*nt* any in the country. Am going to start *didding* a well next week this water hauling sure gets old.

"Will close hoping this finds you all well,
"As ever a friend
(Sgd.) A. D. Miller
"Lindrith N. Mex
Jan. 6–41

"Mr. Nelms,

"How are you folks will I hope we are fairly well, a bit of flu*e* going around this winter here. It is has been an a*u*ful wet winter so far lots of wet snow. Well I am still sort of down yet but raised a good feed crop last season so am setting pretty good this year as I have feed & seed enough to carry me clear th*ough* so if nothing un-u*sal* hap*ins* will be able to make you a payment next fall. I have done considerable improving last year built a house & out building on the east of the place last spring so would be closer to *shool*. The old house had rotted on the north side till it was about

to fall down, so had to build something. Have put in a 700 yard dam for another tank & expect to make another this summer some larger.

"Am testing for water but havent found any yet up at this end, am in hopes of finding some close to the house.

"Will close for this time hoping this finds you all well.

"Yours sincerely (Sgd.) A. D. Miller. "P.S. When you write to me wish you address it to Regina in care of G. D. Grigsby.

"Lindrith N. Mex.
Nov. 10–41

"Mr. Nelms

"How are you folks? We are all well down here thought I would write you a letter & let you know how things are going here we had a hard freeze on the 8th Sept which froze all the beans & corn & feed crops. those that had grain were *were* all right grain such as r*i*e oats & wheat made good this year, but us that just had beans corn & feed were froze, my corn had ice in the *peath* of the ears & was just be-g*in*ing to dent so it ruined it & the beans were just starting to pinto a few harvested their beans but there are not any good too many frosted beans. am figu*e*ring on planting the old ground to wheat, oats & barley & clearing some more sage for beans & corn next year, I have done a lot of work here & hate to give it up if I do*n*t loose heart believe will hit sometime. There is

lots of people leaving here this fall. am going to do some soil er*u*sion work such as spreader dams & terraces under the AAA So if it is allright with you will stay with it & keep the taxes p*a*yed until I can pay you some.

"Yours res*p*eably
(Sgd.) A. D. Miller.

"P.S. We have some trouble getting our mail so when you write to be sure I get it it should be registered.

"Lindrith N. Mex.
3–8–47

"Mr. Nelms, how are you folks, we are all well here.

"We have had some very cold weather this winter 46 below one night.

"Thought I write & tell you that I have made arrangements for some moneys & can pay you some time next month. Do you folks still own the Hall place, if so & you would want to sell it, I think I could sell it for you. (over) If you do, let me know what you want for it. The Lofton ½ section joining me on the west sold last month for $1,200 & the same fellow wants to buy another ½ sec.

"Yours Resp.
(Sgd.) A. D. Miller.
"Lindrith N. Mex.
4–20–48

"Mr. Nelms,

"How are you folks? We are all well here. have been intending to write you

for sometime about this place. I have information that the—is an outfit trying to buy this place from the state on a tax title I have*nt* had time yet to investigate thr*oue*ly what I learned so far, it se*a*ms there is some back taxes before I started paying them, well I am sure there is*nt* any for ten years back.

"Now this oil scare here has*nt* caused any boom yet of co*a*rse there is a possibility there is some oil here.

"Since I have starved along here for 11 years I feel that in paying you for the place now I should have a part of the mineral right, if there should be oil here I think a ¼ of a Sec. would be plenty for any one family. on the other hand if there should be oil on the place it would*nt* be worth much as a farm, so if you can give me an abstract & we can agree on the mineral right I can raise the money to clear it up. Yours Resp.

"(Sgd.) A. D. Miller

"Ans. soon.

"Lindrith N. Mex.
5–19–48

"Mr. Nelms, About this place I have been to Santa*fa* & the county Seat, ca*nt* find any thing irregular with the taxes. It seems all these people had to go on was that it is *i*l*e*gal for me to pay taxes with my exemption on some body els*es* place with out a contract co*a*rse they did*nt* know we have a contract. I kin*da* got took in by these same people that would like to get this place for nothing, I had the *l*ofton place bought on crop payments last spring, this banker wanted some land here so I made a deal with him to turn him the Lofton place & in return he was to loan me money enough to pay you & enough extra to clear out the rest of this valley & plant it to wheat, he has been hanging fire for a year now on my end of the deal, now he says he can loan me enough to pay you but ca*nt* loan me any to clear (over) the rest of the place, guess he knows I have*nt* got a chance in the wo*u*rld to pay him unless I can get the rest of this cleared & planted to wheat, I have found out how to raise winter wheat here & I believe I can easily pay out with it.

"I am going to make you a *pop*osition, would you consider renewing our contract of making a new one for say five years. I think I can raise enough money to get around 150 acres of wheat planted this fall. But if you do*nt* want to do this will go ahead & borrow the $2,500 & pay you out, so if you want the money now you can get an abstract made up & send it to the New Mex. State Bank or send it to me & I will take it there for a lawyer to look at & if it is all right will get the deal *though* as quick as possible can let this bank handle

the transction on this end as that is where I an getting the loan.

"Yours Resp.
(Sgd.) A. D. Miller.

"Grand Junction, Colo.
June 1, 1948

"Dear Mr. Miller—I received your letter a few days ago and in regard to the place will say that as things stand at present we don't think we would want to make a new contract but if you can get the $2500 to pay off the place as priced in the old contract that will be O.K.

"So far I have not found out just how to get the abstract as there are no abstractors in that county but am writing to the county clerk to see what he knows about it. It may be that he can furnish one. So will get it as soon as I can.

"I didn't get to come over when I expected to as I can't always get time off from my job when I want to but am planning to come over yet if I can get off.

"About the mineral right on half of it as you suggested—I don't know which end of it you would want but that would not make any difference to me. I would hold whichever end you wanted me to.

"Hope this finds yourself and family well and hope to see you before too long. And will let you know about the abstract as soon as possible.

"Yours very truly,
(Sgd.) Nealy L. Nelms

"Lindrith N. M.
13–8–48

"Mr. Nelms,

"received your letter Wednesday & have contacted Mr. Adams. If you will send the abstract too New Mexico State Bank Albuquerque N. Mex. Attention R. E. Adams. which will insure its safe handling by bank, & lawyer inspetion.

"Then the deed & moneys can be handled there. If it doesnt make you any difference I will take the 160 A of mineral the house is on. I think it has to be stated in the deed which portion you reserve & then I presume my half will have to be transfered to me.

"Mr. Adams is to notify me as soon as the papers are all in order then I will come to town & sign the papers & finish the deal.
(Sgd.) A. D. Miller.
(reverse side of above letter)

"give him an answer right after the first of September if you and I still have not made satisfactory arrangements. I feel that now is the time for me to get my money out of it so see what you can do and let

me know as soon as you can and I will hold off the other offer until after Sept. 1st.

"Yours very truly

(Sgd.) Nealy L.
$2500.00 Nelms.

"Mills Located at
Heck Canyon, N. Mex.

R. E. Adams Lumber Co.
"Shipping Point:
Springer, N. Mex.
"Heck Canyon, via Springer, N. Mex.
August, 18th, 1948

"Mr. Nelay L Nelms,
Grand Junction, Colo.
"Dear Mr. Nelms;

"Your letter with Abstract just received, will say at the time I agreed to let Mr. Miller have $2500.00 to but the 640 Acres there had been no Oil Lease made for any part of the land, and in my recent conversation with Mr. Miller he told me that the mineral rights went with the place, consequently there must be some little missunderstanding, for you know that without the mineral rights this land does not warrant a loan of $4.00 per acre. Neither do I like the oil lease that you have made any too well even tho you did not want to reserve 160 Acres, in other words I just do not see my way clear to loan that amount of money on this land only under the conditions as I understood them and that is the *the*

mineral rights belonged to the land, please advise.

"Yours truly,

(Sgd.) R. E. Adams.

"Grand Junction Colo
Aug. 23, 1948

"Dear Mr. Miller—I have just received a letter from Mr. Adams and it begins to look as if the three of us will not be able to do business together. He says he didn't understand that I was keeping part of the mineral right. Also he seemed displeased that there is a mineral lease already in force. As far as I can tell there is nothing further I can do about it so I will write and ask him to return the abstract if he cannot see his way clear to go ahead with the deal as agreed on.

"Yours very truly

(Sgd.) Nealy L. Nelms

(5¢ Air Mail Stamp)

"Lindrith, N. M.
10–18–48

"Mr. Nelms,

"I *finaly conecte*d Adams & I think he was just using that q*uate*r of mineral right for an excuse not to make me the loan. I think his par*d*ner was supposed to get this place. It has sort of left me in a jack pot,

but I can get the money by the first of the year all right on the terms of our deal.

"Yours truly,

(Sgd.) A. D. Miller.

"Grand Junction, Colo.
Dec. 3, 1948

"Dear Mr. Miller—I am sorry I have been so long answering your letter, but my wife and I have been undecided what to do. We have never been anxious to dispose of the place but finally decided that if we could get the money out of it in the next few months we might use it to good advantage here. So if you still want it for $2500.00 and we keep the mineral right on the 160 acres at the lower end as we agreed last summer we will still do business. We would like to know as soon as possible after the first of January whether you will be able to handle the deal.

"Hope this finds yourself and family well, etc.

"Yours very truly

(Sgd.) Nealy L. Nelms.

"Lindrith N. Mex.
12–28–48

"Mr. Nelms,

"recived your letter some time ago, but have been down with a bad cold that settled on my lungs & just got to where I can get out so am going to town & start negotating for a loan to pay you. It may take a couple of weeks.

"Yours truely

(Sgd.) A. D. Miller

"Lindrith N. Mex.
7–13–49

"Mr. Nelms

"How are you folks we are all well here but having lots of rain & the roads are sure muddy, which is kinda aggrivayting.

"About this place I have finally raised the money so we can get straitened out now, with you retaining 160 acres of mineral right & 160 going with the land as agreed. I think it should be split the long way that is ¼ wide & a mile long.

"Let me know as soon as possible & we can get this thing off or minds.

"Yours Resp.

(Sgd.) A. D. Miller

"Grand Junction Colo.
Oct. 29, 1949

"Dear Mr. Miller.

"It was very hard to understand what you said over the telephone so I am not sure I got just everything and in case you were unable to understand me will say that I no longer own all of the mineral right in the place there. However I did keep a small share for myself. The land itself is for sale and a considerably better figure than the original contract we made and

which I no longer consider binding since you have failed to meet nearly all of the provisions of it.

"I am now willing to sell the land without mineral right for $1500.00. At this price it should be a cash deal as I need the money pretty badly. But if you could make a substantial payment terms could be arranged.

"As I say I need the money and want to sell so if you are not interested in a deal on it I will probably advertise it in the Albuquerque paper or list it with a real estate man but will not do this until after the first of the year. So let me know before that time if you want to deal.

"Yours truly

(Sgd.) Nealy L. Nelms"

(Italics ours.)

Appellee, Nealy L. Nelms, on cross examination, testified:

"Q. Now, I will ask you, Mr. Nelms, you have testified, I believe, that in 1937 you extended the time of all the notes one year, is that correct? A. That's right.

"Q. Did you advise the bank of that? A. No.

"Q. Now, in 1938 again you extended the time of payments on all the notes for an additional year, is that correct? A. I can't say that I specified a year, but I did say he could go ahead and live there an-

other year and make an effort to resume payments.

"Q. Then in 1939, you did the same thing, didn't you? A. After 1938, I am— I didn't specify any certain length of time, I told him that if he wanted to go ahead and live there and pay the taxes and see whether he could get in position to start paying or not, it was all right with me to have him stay another year under those conditions. I don't know as you would call that extending the notes a year, but it was permission to stay on another year.

"Q. It was understood that all notes, performance under the contract was extended another year, wasn't it? A. Yes, that was the general idea.

"Q. Now, in 1939 you had a similar agreement, didn't you? A. Well, not exactly similar, by that time I began to see that it was quite doubtful if Mr. Miller would ever be able to make his payments, and I simply told him to go ahead and make his home on the place and take care of the taxes until such time as I saw there was something else I could do with the place, and he continued to stay there under those circumstances. There was nothing said about extending the notes or contract any length of time, it was simply he was staying there taking care of the taxes.

"Q. With the general understanding if he got in a position to take up the contract, he could do it? A. At those times I

consented I would still accept the money but that wasn't a continuing agreement, that was simply for that time.

\* \* \* \* \* \*

"Q. Now, the first couple of years on this, referring to '37 and to '41, during those periods of years, what actually happened, each year Mr. Miller would write to you and tell you he was having a hard time and you would extend the contract? A. I don't know you would call it extending the contract, I just let him go on living there. I knew what a tough time a man in that country was having, and I didn't feel like crowding him in any way, but after the first year, I don't know if you could call it extending the contract. *I just told him to live there and keep the taxes up so it wouldn't come back on me.*

"Q. To keep the taxes up and pay you when he could? A. That's putting it a little too broadly, saying pay me when he could. I would have accepted his money during those years if some better deal hadn't come up.

"Q. And you had a general understanding with Mr. Miller that if he performed with that part of the contract pertaining to the payment of taxes, that you would sort of let the matter of the time of paying the notes be extended? A. Well, not exactly that, you are trying to get the same thing again, aren't you? As I say, I would have accepted his payments along that time, but outside of agreeing that he could go ahead living there and take care of the taxes, I didn't make any definite statement to him about he could still go ahead and pay the money, except at the specific times he wrote me and I would write back that at that specific time I would accept the money. As long as agreeing that the contract would keep indefinitely, I never did that after the first year or two.

"Q. Did you ever, at any time, offer to return Mr. Miller's notes? A. No, I didn't.

"Q. Did you ever make a demand upon him, after you received those notes in your possession, for the payment of them? A. No, sir, I never did.

"Q. Have you ever, up to this time ever made demand for the payment of the notes or the contract? A. I have not, I have told him from time to time if he was ready, or nearly ready to pay, I would accept his money, but as far as demanding payment, I have not.

"Q. You have never demanded payment of those notes up to this day? A. No.

\* \* \* \* \* \*

"Q. How do you place the date that you withdrew that contract? A. Well sir, the bank notified me a few months after the expiration date of the last note. They didn't do it immediately, it was a few months after that, that the contract had

expired and they would appreciate it if I would come and get it, and get it out of their files, and I didn't do it immediately, it was fully a year or more than a year, perhaps, after they asked me to come that I did come to get the papers, and I recall distinctly that was in the winter of 1946, or '47, it was in the middle of the winter, along there sometime, and I would place it in January of 1947.

\* \* \* \* \* \*

"Q. But you had extended the payments of those notes each year from 1937 to '41, inclusive, hadn't you, a year each year? A. No, only the first year or two was there any specific mention made of extending the notes.

"Q. And wasn't it your intention on each of those subsequent years, to take the same action you had previously taken? A. No, I wouldn't say it was, except at the time that I specifically said so to Mr. Miller.

\* \* \* \* \* \*

"Q. You never advised Mr. Miller that you had taken his notes and the other instruments placed in the bank from the bank, did you? A. No, I didn't. \* \* \*"

From all that appears from the record we are convinced that appellee Nelms failed to do the thing required of a vendor under such circumstances. He not only failed to declare a forfeiture but on the other hand continued to deal with appel-

lant in such manner as would cause him to believe that he had no such intention.

Appellees Nelms rely strongly on the letter of April 20, 1948, particularly the part which reads, "Since I have starved along here for 11 years I feel that in paying you for the place now I should have a part of the mineral right, if there should be oil here I think a ¼ of a Sec. would be plenty for any one family. \* \* \*" as proof that appellant considered the contract forfeited. Standing alone, the letter would appear quite inconsistent with appellant's contention. But in view of prior and subsequent events, the letter merely indicates that appellant was somewhat confused as to his rights. Noticeably, in the very next letter, dated May 19, 1948, while discussing a tax problem, appellant says, "\* \* \* they didnt know we have a contract." The existence of the contract is not challenged by Nelms in his response thereto of June 1, thereafter. These letters were written some 15 months after Nelms had withdrawn the contract, deed and notes from the bank without appellant's knowledge and, during which time, he had failed to inform appellant of such withdrawal, tender him the notes, or say one word regarding forfeiture, except possibly his last letter, after appellant had offered to consumate the deal.

The mere failure to make stipulated payments does not make the contract

void or work a forfeiture of it. At 3 Black on Rescission and Cancellation, section 569, we find the rule stated: "Where a contract for the sale of real estate reserves to the seller the right to declare the contract void in case the purchaser shall make default in the payment of the price, failure to make the stipulated payments does not of itself make the contract void or effect a forfeiture, of it, but the vendor must give notice of his election and intention to forfeit the contract, * * *". See also, Park v. Milligan, 27 N.M. 96, 196 P. 178; Rudy v. Newman, 54 N.M. 230, 220 P.2d 489; Petrakis v. Krasnow, 54 N.M. 39, 213 P.2d 220; Plas v. Aldrich, 238 Mich. 343, 213 N.W. 80; State Bank of Sevier v. American Cement & Plaster Co., 80 Utah 250, 10 P.2d 1065; Hughes v. Burton Lumber Corp., Tex.Civ.App., 188 S.W. 1022; South Florida Farms Co. v. Hall, 84 Fla. 233, 93 So. 687.

A vendor cannot acquiesce in delay and then rescind, without giving notice of his intention to insist on strict compliance. The principle is announced at 3 Black on Rescission and Cancellation, section 570:

"* * * where a right of forfeiture once accrued has been waived or suspended, where there has been forbearance or condonation of previous defaults,—as, where the party to whom the payments are to be made has granted extensions of time, or acquiesced in delay, or accepted overdue payments without objection,—he cannot thereafter forfeit or cancel the contract without first giving distinct and sufficient notice of his intention to insist on strict compliance with its terms. * * *

"* * * to state the rule in its broadest terms, where both the parties to a contract of sale have taken considerable latitude in its performance, without manifesting any intention to hold each other to a strict and literal performance, neither party can abruptly rescind for noncompliance without fair warning of an intention to insist upon a literal compliance with the contract in the future. * * *"

It is stated, at 107 A.L.R. 385, that: "Where indulgence has been extended until long after all installments of purchase money have become due, a forfeiture cannot be asserted upon the mere basis of the continued nonpayment."

The author continues at page 388: "* * to entitle a vendor to assert a forfeiture for default in payment, his conduct in reference to such forfeiture, must have been positive, unequivocal, and inconsistent with the continuance of the contract."

See, Suburban Homes Co. v. North, 50 Mont. 108, 145 P. 2; Ann.Cas. 1917C, 81; Hall v. Delaplaine, 5 Wis. 206, 68 Am.Dec. 57; 55 Am.Jur., Vendor and Purchaser, sections 623, 625, 627.

Also, the right of forfeiture is waived by continuing negotiations, or, where an indefinite extension of time has been granted. Kingston v. Walters, 16 N. M. 59, 113 P. 594; Gustason v. De Haven, 134 Kan. 324, 5 P.2d 1095. See also, 55 Am.Jur., Vendor and Purchaser, sections 628, 630. Clearly, the doctrine of estoppel is applicable here.

This brings us to the question whether cross appellees are innocent purchasers for value and without notice. Appellee, Dudley Cornell, caused a meeting to be held of the property owners of the Lindrith community. There is a conflict in the testimony as to just what transpired between Miller and Cornell when the latter made inquiry of him as to the nature of his rights under the contract with Nelms. Miller's possession, of course, imposed upon Cornell the duty of seeking to ascertain the nature and character of the former's claims. By the same token, it was Miller's duty to make full disclosure of his claims when inquiry was made of him. Cornell testified in substance that Miller was somewhat vague and mysterious as to what interests, if any, he had in the land when he was asked to go into some detail about them and refused to do so. Miller, on the other hand, says he informed Cornell that he had a contract for purchase of the place and gave him full information about the contract.

Cornell's testimony, in part, is as follows:

"Q. Did he tell you he had a contract on the property? A. No, he didn't go into that much detail, he was very vague.

"Q. And whether it involved trying to get the money to pay up his own contract? A. I understood it involved getting the money to buy.

"Q. Was that based on your understanding? A. What he told me.

"Q. Did he tell you he was in possession of the place? A. I knew he was living on it.

* * * * * *

"Q. He never did tell you he was just a tenant, did he? A. No, he said that he was living there, and he was dealing for it, that was his terms, he was trying to make a deal for it.

* * * * * *

"Q. And when you went to see Mr. Nelms for the first time you found out what Mr. Miller's interest on the place was, is that right? A. That's correct.

* * * * * *

"Q. You didn't examine the contract to see what the rights of the parties would be? A. I didn't know it was still in existence.

* * * * * *

"Q. Didn't you also know that the land had been assessed for taxes to Mr. Miller? A. Yes, that showed on the record.

"Q. On the certificate you obtained? A. That's true.

"Q. So at the time you obtained this oil and gas lease you knew that the land had been assessed to Mr. Miller continuously since '37 to the date you were dealing and was still so assessed? A. That's right.

"Q. You knew Mr. Miller was in possession? A. That's right.

"Q And negotiated with Mr. Miller to obtain the lease? A. Yes.

"Q. And you ascertained from Mr. Nelms that he had held it under contract? A. That's true.

"Q. And you didn't see the contract to determine what the rights of the parties still were? A. No, I took his statement that it had been cancelled and he hadn't paid anything on it since 1937.

"Q. But you knew he had been paying the taxes, or had it assessed? A. That's right.

"Q. And you knew Mr. Nelms wasn't an attorney? A. That's true.

"Q. And you didn't inquire at all as to what proceedings were made for the cancellation of the contract? A. No, sir. * * *"

▮ Unfortunately, the trial judge failed to make any finding resolving the conflict in the testimony of Cornell and Miller on the decisive issue thus raised in their testimony as to whether Cornell made adequate inquiry in an effort to ascertain the rights claimed by Miller under the contract, nor do we find a request for such finding by cross appellees. Even though the contract were not cancelled, as claimed by Nelms, if Cornell tried unavailingly to learn from Miller what his rights were then it could not be said he did not pursue the inquiry with sufficient diligence. The burden was on cross appellees to show sufficient inquiry was made. But the findings being silent on the issue whether Cornell made adequate inquiry of Miller, the court will presume an adverse finding against cross appellees. Byerts v. Schmidt, 25 N.M. 219, 180 P. 284; Ringle Development Corporation v. Town of Tome Land Grant, 49 N.M. 192, 160 P.2d 441; Pyeatt v. El Paso Natural Gas Co., 54 N.M. 70, 213 P.2d 436.

▮ It is a general rule that open, notorious and exclusive possession of real estate under claim of ownership, is constructive notice to the world of whatever claim the possessor asserts, whether such claim is legal or equitable in its nature. McBee v. O'Connell, 19 N.M. 565, 145 P. 123; Christmas v. Cowden, 44 N.M. 517, 105 P.2d 484; Wren v. Wren, 199 Ga. 851, 36 S.E.2d 77, 162 A.L.R. 204; Permian Oil Company v. Smith, 129 Tex. 413, 73 S.W.2d 490, 107 S.W.2d 564, 111 A.L.R. 1152; 8 Thompson on Real Property, section 4514.

The author says: " * * * Possession does not amount to constructive notice of the nature and extent of the rights of the person in possession, but it puts the purchaser upon inquiry as to such rights. He is bound to pursue the inquiry with diligence, and to ascertain what those rights are. * * * A purchaser who negligently or intentionally fails to inquire as to the fact of possession, or as to the title or interests of the person in possession, is affected with notice of such title or interest as the possessor actually has. * * *"

 It follows that Cornell had actual notice and that cross appellees had constructive notice of appellant's possession and claim of ownership. Such notice was sufficient to put all appellees on inquiry of all facts which the inquiry, if pursued with proper diligence, might reveal. Taylor v. Hanchett Oil Co., 37 N.M. 606, 27 P.2d 59; Sawyer v. Barton, 55 N.M. 479, 236 P.2d 77; Mainwarring v. Templeman, 51 Tex. 205; Strong v. Strong, 128 Tex. 470, 98 S.W.2d 346; 2 Pomeroy's Equity Jur. 4th Ed., section 615, pp. 1166, 1167.

The views expressed renders further discussion unnecessary. The trial court's findings are cancelled and set aside. The judgment will be reversed, with directions to the trial court to enter an order reinstating the case upon its docket and enter judgment quieting appellant's title, subject to the lien of appellee Nelms for the purchase price and interest. And it is so ordered.

LUJAN, C. J., and McGHEE and COORS, JJ., concur.

SADLER, J., dissenting.

SADLER, Justice (dissenting).

In my opinion the contract under which defendant, Miller, claims had become lapsed and abandoned following continuous defaults by him thereunder and was so treated by all parties, Miller, himself, acquiescing in the view that it was dead. It had remained in that state for several years before the dealing out of which present controversy arises took place. To say the least, this is the way the trial court viewed the matter, and having found accordingly, I see no way in which we can with propriety overturn those findings, being supported by substantial evidence.

I am familiar with the rule that forfeitures are not favored and that slight circumstances will ordinarily be seized upon to avoid them. But when the two parties to a contract either expressly or by strong implications arising on conduct, agree that a contract no longer exists and has lapsed and terminated, the rules mentioned cease to operate and no longer control. The trial court might have found as the majority do and have directed entry

of the judgment they order but it declined to do so, viewing the facts differently. In my opinion we are bound by the findings. Accordingly,

I dissent.