428 P.2d 678

**KAMMERT BROTHERS ENTERPRISES, INC., a corporation, Appellant,**

**v.**

**TANQUE VERDE PLAZA COMPANY, a corporation, Appellee.**

**No. 8110–PR.**

Supreme Court of Arizona, In Banc.

June 8, 1967.

Chandler, Tullar, Udall & Richmond, Lesher, Scruggs, Rucker, Kimble & Lindamood, Johnson, Darrow, D'Antonio, Hayes & Morales, Tucson, for appellant.

Boyle, Bilby, Thompson & Shoenhair, Tucson, Morris M. Grupp, San Francisco, Cal., for appellee.

LOCKWOOD, Justice:

This action is one for damages for breach of contract for sale of commercially zoned real estate near Tucson, Arizona. The buyer of the property, Tanque Verde Plaza Company, a corporation, brought suit against the seller, Kammert Brothers Enterprises, Inc. Certain issues were submitted to the jury on special interrogatories, which were answered favorably for the plaintiff-buyer. By stipulation, the issue of damages was tried to the court, and a judgment entered in favor of the plaintiff for $244,399.14, on May 20, 1963. Upon defendant's appeal to the Court of Appeals, Division II, 4 Ariz.App. 349, 420 P.2d 592, the latter affirmed the judgment in favor of plaintiff, but reduced the amount of damages. The matter being before us on a writ of review, the opinion of the Court of Appeals is vacated.

The contract of sale was executed by the parties on April 12, 1960, calling for a total

purchase price of $390,000 with $60,000 payable at the time of execution, yearly installments starting March 1, 1961, and interest payable in quarterly installments, beginning June 15, 1960. An escrow agreement was signed and deposited with an escrow agent, along with a conveyance back to the seller in the event of the buyer's default. The escrow instructions provided that the balance of the purchase price would be paid to the escrow agent, and that upon payment in full of the purchase price, the deed from seller to buyer was to be recorded. Time was made of the essence in the contract. The contract also contained a provision that upon default of the buyer of any of the terms, the seller at his discretion, could either forfeit and terminate the contract, or treat the contract as continuing, and enforce it against the buyer.

The $60,000 down payment was made on time. The first two quarterly interest payments were paid and accepted after their respective due dates, one being accepted over a month late. The buyer had planned to build a shopping center on the subject property, and being unable to secure the necessary financing, asked for an extension of the March 1, 1961 payment on the principal of the contract. Two extensions of this payment were granted informally by the seller, through letters by its attorney to the buyer's attorney. The validity of these extensions is not in dispute, the extension to expire on October 4, 1961.

On September 30, 1961, officers of the seller and buyer met in Tucson, Arizona, together with buyer's attorney, a real estate agent connected with the transaction, and one Max Schmidt, in order to discuss the contract. The buyer had previously conferred with Schmidt on a proposed transaction in which Schmidt would exchange certain property in California, plus cash and his personal note, for the subject property. The buyer and his attorney testified that at this meeting an oral extension was given until January 1, 1962, in order to bring payments on the contract up to date. This was disputed by the seller, but its president,

Gilbert J. Kammert, admitted that at least a forty-five day extension was given.

Thereafter, Damiano, the secretary of the buyer corporation, and its principal negotiator, made ten to fifteen trips to Los Angeles, California in an attempt to secure a mortgage commitment in connection with the Schmidt exchange proposal. Representatives of the seller went to California in October to look at the Schmidt properties, and told the buyer's attorney that if this proposed transaction went through, the seller would require $210,000 cash, plus a $180,000 note from Schmidt, and a note from Damiano for $15,000. The buyer's attorney was also informed that if the buyer was agreeable to these terms, the seller would grant an extension until November 15 to get a mortgage commitment, and if one was obtained, until February 1, 1962 to close the deal. The attorney said he would inform the buyer, but no agreement was ever drawn, and no exchange of property was ever made. A joint venture between the buying and selling corporation for development of the shopping center was discussed during the latter part of November, but on December 4, officers of the seller told the buyer they could not engage in the venture for tax reasons.

Various other conversations and meetings transpired between members of the two corporations and pertinent parts of these will be discussed hereafter. On December 19 and 21, 1961, Damiano informed Gilbert J. Kammert, the president of the seller corporation that the buyer had located parties willing to take over the contract of sale, and either pay the entire amount then due on the contract, or pay the principal payment then due plus interest, at the seller's option. This proposal was declined, Gilbert Kammert saying that an additional $50,000 would be required because the property had appreciated in value since the original contract had been executed. After another meeting on December 28, 1961 did not result in a written contract, the buyer on December 29, sent written notice to both the seller and the escrow agent that it considered the

contract to be in default because of the seller's refusal to accept its offers. A final meeting was held on January 12, 1962, with members of the group of investors the buyer had interested in taking over the contract being present. The seller's representatives told them they would not proceed with the original contract, but required a new one for $390,000 on a new contract. The investors were not interested in this offer and left.

On January 31, after giving the escrow agent a letter of indemnity, the seller obtained deeds from the agent, conveying the property back to it. No written notice was ever given buyer as to any definite date of forfeiture if the payments were not brought up to date.

One of the determinative issues of this appeal is whether a ninety day oral extension of payment under the contract was granted by the seller to the buyer in their September 30, 1961 meeting, and if so, whether such extension was binding on the seller. In an answer to an interrogatory put to it, the jury found that the seller had agreed that the buyer had until January 1, 1962 to pay all sums due under the contract. The jury also found that the defendant by its actions led plaintiff to believe that it had such an extension to January 1, 1962, and that the plaintiff-buyer acted on such belief. Adequate testimony exists to support these findings as to the extension being granted.

Kammert Brothers contend that the oral extension was rendered invalid because it failed to meet the requirements of the statute of frauds, § 44–101 A.R.S. (that certain agreements be by written memorandum.) However, regardless of whether the extension agreement would be considered enforceable under the statute, its existence is evidence of the seller's intent to waive strict performance of the forfeiture provisions of the contract. Substantial authority exists in support of the view that such an oral extension of time of payment, followed by conduct of the vendor inconsistent with demanding strict compliance with the contract, results in a waiver of the forfeiture provisions of the contract. Stark v. Norton, 24 Ariz. 454, 211 P. 66 (1922); Di Giuseppe v. Di Giuseppe, 373 Pa. 556, 96 A.2d 874 (1953); Nelms v. Miller, 56 N.M. 132, 241 P.2d 333 (1952); Bugajski v. Siwka, 200 Mich. 415, 166 N.W. 863 (1918).

In addition to the oral extension given to the buyer, the vendor through its officers, explicitly assured the buyer on several occasions that no action toward forfeiture would be commenced before January 1, 1962, the last such statement being made in the latter part of December, 1961. It is not disputed that at least up until January 9, 1962, the seller had not exercised its discretion to terminate the buyer's interest in the property and therefore was continuing to hold the buyer to its obligation. On October 25, 1961, Kammert Brothers sent a tax bill on the property to the buyer's attorney. The buyer's secretary, Damiano, paid most of the taxes due on the property. The buyer also expended considerable amounts of time and money in reliance on the extension, with the seller's knowledge. The seller further discussed a possible joint venture with the buyer, and granted two informal written extensions, as previously stated. These actions by the seller are clearly inconsistent with a demand for strict compliance of the contract.

Once strict performance of the contract has been waived as to timely payment, a clear and definite notice to buyer followed by allowance of a reasonable time to bring payments up to date would be necessary in order to reinstate the forfeiture clause of the contract. Arizona Title Guarantee & Trust Company v. Modern Homes, Inc., 84 Ariz. 399, 330 P.2d 113 (1958); Onekama Realty Company v. Carothers, 59 Ariz. 416, 129 P.2d 918 (1942); Moeller v. Good Hope Farms, Inc., 35 Wash.2d 777, 215 P.2d 425 (1950). As stated in Modern Homes, supra, the vendor by its waiver of strict performance is held to have waived any prior defaults, and the vendee is not in default until after it fails to comply with the required notice. Then pursuant to § 33–741

A.R.S., since less than 20% of the purchase price had been paid, forfeiture of the interest of purchaser in the sales contract could not be accomplished until thirty days had passed from the time of default. Damiano, by his own admission recognized that the seller was insisting upon performance by the first of the year. Therefore, the period of default could not have begun before January, 1962, with the thirty day grace period being in effect during that month.

The next issue which must be decided is whether the seller's actions during the three month extension period resulted in a breach of the sales contract. As we previously mentioned, on December 19 and 21, 1961, Damiano together with one of the buyer's attorneys, held telephone conversations with Gilbert J. Kammert, the seller's president. The conversations were recorded by Damiano. Kammert was informed that the buyer had located parties ready to take over the contract and pay all sums due to date, or pay the entire amount then due on the contract. Kammert, on December 19 refused to accept the buyer's offer. On December 21, Kammert said he had talked to all members of the corporation but one, and they definitely required an extra $50,000 because the value of the land had increased. Damiano said that the people he had located were ready to go right now at the original contract price, but this offer was clearly refused by Kammert on behalf of his corporation. Kammert admitted at the trial that the selling corporation had decided they would not accept this offer.

We believe that the refusal by the seller of the buyer's offer was an anticipatory repudiation of the contract by the seller, resulting in a material breach of the contract. It is necessary in order to find a breach that there be a positive and unequivocal manifestation on the part of the repudiating party that he will not render the required performance when it is due. Diamos v. Hirsch, 91 Ariz. 304, 372 P.2d 76 (1962). The contract here was still in existence and binding on both parties, the buyer having the right to perform at any time during the extension period, and the seller still having a duty to perform. The seller had no right to reject Tanque Verde's offers to meet the contract terms. Its rejection was unequivocal. Kammert stated in the telephone conversations that " * * * I am positive that we wouldn't go under $400,000" and later, "Well there, I don't think there's a chance in ten thousand of us taking it," all in reference to buyer's offer to pay under the original contract. Therefore, we think that there was ample evidence to support the jury's finding that during the extension period the buyer or someone in its behalf offered to pay the seller the full amount of principal and interest then due on the contract, which offer was rejected by the defendant-seller.

We must next consider whether the buyer was required to make a formal tender of the amounts due on the contract in order to recover damages for breach of the contract. Kammert Brothers here had positively refused Tanque Verde's offer to perform its duties under the contract. Therefore tender of the purchase price by the buyer was excused, since an actual tender is unnecessary where it is clear that the other party will not accept it, rendering the act useless. Lee v. Nichols, 81 Ariz. 106, 301 P.2d 1022 (1956); Schmitt v. Sapp, 71 Ariz. 48, 223 P.2d 403 (1950). It was sufficient that the buyer was ready, willing, and offered to perform. Lee v. Nichols, supra. It was clearly established that such was the case here.

The seller claims there can be no anticipatory repudiation here since the buyer failed to immediately treat the repudiation as a breach and bring suit. We believe that it is not necessary to say that a breach is not an anticipatory breach until it has been accepted as such by the injured party. A party that has received a definite repudiation by the other party to the contract should not be penalized for his efforts to make the other party live up to his end of the bargain, and can cease urging performance and bring suit for the breach at any time before the other party retracts his

repudiation. French v. Nabob Silver-Lead Company, 82 Idaho 120, 350 P.2d 206 (1960); Carvage v. Stowell, 115 Vt. 187, 55 A.2d 188 (1947).

■ In the present case, the seller never attempted to withdraw its repudiation of the contract. A meeting between officers of the parties on December 28, 1961, ended without agreement, the seller refusing to put any new agreement into writing. On January 9, 1962, the seller demanded the deeds back from the escrow agent, the demand being refused. On January 12, 1962, seller again refused an offer to pay the original contract price. The buyer here was merely urging that the seller go through with the original contract, and did not waive the seller's breach. On December 29, 1961, Tanque Verde sent written notice to both Kammert Brothers and the escrow agent, declaring the contract to be in default, and inviting the seller to cure such default. Suit was then brought after seller obtained the deeds back from the escrow company on January 31, 1962.

■ The seller has placed great weight upon the effect of the escrow agreement, claiming that it had performed its obligations under the contract by placing a deed to the buyer in escrow, and therefore could not be found to have breached the contract. In the present case, however, the strict terms of the escrow agreement had been altered by mutual consent of the parties. There had been three extensions of the time of performance of the contract, without notice to the escrow agent. Damiano had given seller a note for interest due on the contract. This was transmitted directly to the seller and not delivered to the escrow company. In fact, had the buyer tried to pay the escrow company, it would have run counter to the seller's own written instructions to the escrow company on October 3, 1961, which ordered it "to accept no more payments of any kind on this collection unless specifically requested to do so by Kammert Brothers Enterprises, Inc., in writing. As of this date we declare this contract in default, and you are so instructed." It is clear that both parties had waived the effect of delivery to the escrow company, and that in no way could the seller be deemed to have performed.

The conduct of the seller throughout this whole transaction amply supported the Superior Court's conclusion that the seller breached the contract of sale. The seller refused to accept an offer of payment under the contract, after first extending the time of performance, and was therefore justifiedly found liable for damages resulting from the breach.

The judgment rendered on May 20, 1963 awarded the buyer the following damages:

| | |
|---|---|
| Principal paid on the contract | $60,000.00 |
| Interest paid on the contract | 28,400.00 |
| Taxes paid on the land covered by the contract | 1,654.88 |
| Architect Fees | 21,572.56 |
| Topographical map | 598.30 |
| Soil tests | 2,306.50 |
| Attorneys Fees (already paid) | 9,366.90 |
| Accountants Fees | 2,000.00 |
| Travel Expenses | 1,000.00 |
| Sub total | $126,899.14 |
| Brought Forward | $126,899.14 |
| Loss of bargain under finding of bad faith by the jury | 110,000.00 |
| Attorneys Fees | 7,500.00 |
| | $244,399.14 |

The seller's principal objection to the damages concerns the recovery of the $110,000 for loss of bargain under the findings of bad faith by the jury. In the instructions given to the jury on this issue, bad faith was defined as "a willful deliberate refusal to perform its contract without legal cause or excuse."

 Where the vendor, without justification, willfully refuses to perform his contract for the sale of real property, such vendor is liable to the vendee for the loss of his bargain, or the difference between the value of the land at the time of the breach and the contract price. County of Lincoln v. Fischer, 216 Or. 421, 339 P.2d 1084 (1959); Rabinowitz v. Debow, 104 N.J.L. 62, 138 A. 891 (1927); 55 Am.Jur. Vendor and Purchaser § 564. Thus, it can be said that bad faith on the part of the seller was required in order to recover for a loss of bargain, at least in the sense that the bad faith is the willful refusal of the seller to perform.

 There is ample evidence here for a finding that seller's refusal was willful and deliberate. The conduct of the seller throughout the entire period of the extension is consistent with an intention never to convey the property at the original contract price. Richard Kammert, an officer and director of the selling corporation, admitted on cross-examination that from October 2, 1961, on the seller was trying to keep the buyer in the deal to avoid taxes on a repossession gain. Further, Gilbert Kammert stated in the telephone conversation of December 19, 1961, that seller did not want to stick to the original contract price because the property had appreciated in value. An instruction to the jury in this regard was not improper.

 The seller also claims that two summaries of business expenses admitted into evidence could not be the basis of certain items of damage awarded, but rather that the supporting books of account should have been put in evidence. The defense counsel admitted at the trial that every item now questioned on the summary, except that of travel expenses had been actually paid by the buyer. Counsel was allowed to examine books of account on travel expenses, and these were later admitted in evidence. We think therefore this claim is without merit.

 Finally, the seller claims that an amount of $7,500 as attorney's fees should not be allowed in an action for breach of the contract. Such fees may be allowed when the contract so provides. Colvin v. Superior Equipment Company, 96 Ariz. 113, 392 P.2d 778 (1964); Commercial Standard Insurance Co. v. Cleveland, 86 Ariz. 288, 345 P.2d 210 (1959). The contract provided:

"If any suit shall be brought by either party to enforce or cancel this contract, the prevailing party to said suit shall be entitled to recover all costs and expenses necessarily incurred by him in connection therewith, including a reasonable attorney's fee to be fixed by the court."

We believe that the words "to enforce or cancel" the contract are broad enough to encompass the present action. This suit can be construed as the buyer's means of enforcing its rights under the contract. Provisions of this type should be given a broad meaning rather than a narrow and restrictive one. Leventhal v. Krinsky, 325 Mass. 336, 90 N.E.2d 545, 17 A.L.R.2d 281 (1950).

Appellant set forth some twenty-eight assignments of error all of which have been considered, and although not specifically designated, have been disposed of by our discussion of the legal principles here involved. The judgment of the Superior Court, Pima County, is therefore affirmed.

BERNSTEIN, C. J., McFARLAND, V. C. J., and STRUCKMEYER, and UDALL, JJ., concur.