IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

———————————————

GREAT WESTERN BANK, a bank chartered under the laws of the State of South Dakota, successor-in-interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC, as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervisor on June 4, 2010, *Plaintiff/Appellant*,

*v.*

LJC DEVELOPMENT, LLC, an Arizona limited liability company; JAMES LEO CROWLEY and JANE DOE CROWLEY, husband and wife; JOHN CROWLEY and JENNI CROWLEY, husband and wife, *Defendants/Appellees*.

No. 1 CA-CV 14-0252
FILED 11-10-2015

———————————————

Appeal from the Superior Court in Maricopa County
No.  CV2009-032530
The Honorable Katherine M. Cooper, Judge

**AFFIRMED**

———————————————

COUNSEL

Quarles & Brady LLP, Phoenix
By William Scott Jenkins, Jr., Alissa A. Brice
*Counsel for Plaintiff/Appellant*

Aspey Watkins & Diesel, PLLC, Flagstaff
By Whitney Cunningham, Jennifer M. Mott
*Counsel for Defendants/Appellees*

## OPINION

Presiding Judge Kenton D. Jones delivered the opinion of the Court, in which Judge Randall M. Howe and Judge Peter B. Swann joined.

**J O N E S**, Judge:

¶1          Great Western Bank (Great Western) appeals a judgment entered in favor of Appellees on its claim and counterclaim following a bench trial.  For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2          This appeal arises from two construction loan agreements between Great Western's predecessor[2] and Cedar Ridge Investments, L.L.C. (Borrower).  Appellees are the guarantors of Borrower.

¶3          In early 2007, Borrower sought funding to develop a fifty-home subdivision in Flagstaff to be known as Cedar Ridge.  Borrower first obtained a loan from Great Western to acquire and develop infrastructure (the A&D Loan) in May 2007.  Appellees agreed to guarantee the A&D Loan in an amount up to but not exceeding Borrower's total principal indebtedness to Great Western.  In January 2008, Borrower entered into a second agreement with Great Western to fund the actual construction of homes (the Agreement).  The Agreement required Appellees to execute a guaranty separate from that securing the A&D Loan and was signed by eight bank officials.  By its terms, the Agreement expired on December 1, 2008.

---

[1]          We view the facts in the light most favorable to upholding the trial court's judgment.  *Bennett v. Baxter Grp., Inc.*, 223 Ariz. 414, 417, ¶ 2 (App. 2010) (citing *Sabino Town & Country Estates Ass'n v. Carr*, 186 Ariz. 146, 148 (App. 1996)).

[2]          Great Western's predecessor in interest, TierOne Bank, was closed by the Office of Thrift Supervision and its interest in the loan and litigation was purchased from the FDIC by Great Western in June 2010.  For ease of reference, we refer to both Great Western and its predecessor in interest as Great Western.

¶4 In July 2008, as acquisition and development of the infrastructure was nearing completion and Borrower was preparing to obtain permits for the construction of model homes, Great Western made an internal decision to cease construction financing in Arizona and advised Borrower it was withdrawing from the Agreement. When notified of this decision, Borrower immediately expressed to Great Western its concern regarding the continued viability of the project without the financing agreement in place, slowed construction in an effort to save money, and attempted to secure alternate financing. Borrower's efforts were ultimately unsuccessful, and without financing to build model homes, Borrower could not sell homes in Cedar Ridge and was therefore unable to generate revenue through which to service the A&D Loan.

¶5 Great Western then foreclosed on the A&D Loan, sold the property to another developer, and sued Appellees for the balance of approximately $2.6 million.[3] Appellees conceded they, as guarantors, failed to repay the A&D Loan but sought offset and affirmative relief for profits Borrower lost as a result of Great Western's termination of the Agreement, which they contend constituted anticipatory repudiation and breach of the implied covenant of good faith and fair dealing. The case proceeded to trial for determination of the merit and value, if any, of Appellees' claims and counterclaims which might offset the deficiency owed to Great Western. Great Western submitted a timely request for findings of fact and conclusions of law.

¶6 At trial, Great Western argued it was not required under the Agreement to actually finance construction within Cedar Ridge, asserting the Agreement was merely a "guidance line" or an outline of proposed future loans, and Great Western retained complete discretion to decline funding. The trial court disagreed, noting the Agreement was titled "Loan Agreement," contained express language obligating Great Western to "make the Loans to Borrower," and required Borrower to "accept such Loans," subject to various terms and conditions. And, according to the Agreement's terms, the only basis upon which Great Western was entitled to withdraw its participation was Borrower's default — an event never alleged by Great Western.

---

[3] Although they are named in the caption, John and Jenni Crowley sought bankruptcy protection during the litigation and are not parties to this appeal.

¶7        The trial court concluded Great Western breached the Agreement by unilaterally terminating its obligation to extend financing without conducting case-by-case review of individual loan requests.  The court determined Great Western's breach had prevented Borrower from receiving the benefit of the contract — namely, financing it required to build and market homes within Cedar Ridge, which would have, in turn, provided Borrower revenues through which it would be able to repay the A&D Loan.  The court found Great Western had no valid excuse for doing so because Borrower had the ability to begin construction and was not in default of the Agreement.  Finally, the court determined Borrower had proven with reasonable certainty it would have profited between $2,808,000 and $3,500,000 had Great Western not terminated the Agreement.  Because the lost profits exceeded the outstanding balance on the A&D Loan, the court found Appellees' liability under the guaranty was reduced to zero.  The trial court determined Appellees were the prevailing parties, having "effectively recovered $3.1 million, absolving them of their liability" to Great Western, and awarded Appellees their attorneys' fees and double their taxable costs pursuant to Arizona Revised Statutes (A.R.S.) sections 12-341[4] and -341.01 and Arizona Rules of Civil Procedure 54(f) and 68.

¶8        The trial court denied Great Western's motions to amend the findings of fact and conclusions of law and for reconsideration.  Great Western timely appealed.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

### I.    Interpretation of the Agreement

¶9        In its opening brief, Great Western characterizes the Agreement as "an agreement between Borrower and [Great Western] under which Borrower could request loans after satisfying certain terms and conditions, and subject to an individual case-by-case review by [Great Western]."  Upon this premise, Great Western argues the trial court erred in concluding that "[b]y entering into the [Agreement], [Great Western] agreed to make loans, on a case-by-case basis, provided Borrower complied with the terms and conditions set forth [there]in," re-advancing its theory that the documents were simply an "outline" for future financing.  The interpretation of a contract is a question of law which we review *de novo*. *Colo. Cas. Ins. v. Safety Control*, 230 Ariz. 560, 565, ¶ 7 (App. 2012) (citing

---

[4]       Absent material revisions from the relevant date, we cite a statute's current version.

*Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, ¶ 12 (App. 2006)). In doing so, our primary purpose is to discover and enforce the parties' intent at the time the contract was made, *Taylor v. State Farm Mut. Auto. Ins.*, 175 Ariz. 148, 152 (1993), looking first to "'the plain meaning of the words as viewed in the context of the contract as a whole,'" *ELM Retirement Ctr., L.P. v. Callaway*, 226 Ariz. 287, 290-91, ¶ 15 (App. 2010) (quoting *United Cal. Bank v. Prudential Ins.*, 140 Ariz. 238, 259 (App. 1983)).

**¶10** Setting aside that Great Western's own description of the purpose of the Agreement is nearly identical to the trial court's finding, we find no error. Although Great Western refers to the Agreement as a "guidance line," these words have no legal significance and appear nowhere within the provisions of the Agreement. The contract itself is specifically titled "Loan Agreement."

**¶11** Great Western's internal communications and writings to Borrower refer to the Agreement inconsistently as a "commitment," a "line of credit," a "guidance line of credit," and a "loan agreement." However, in correspondence to Borrower dated the day prior to the execution of the Agreement, Great Western explained the term "guidance line," stating:

> The line of credit that has been approved is a "guidance line," which is an indication of the maximum allowable amount of loans outstanding that you may have with [Great Western] during the term of the guidance line. Even though this is a commitment, each individual housing start and lot purchase is subject to [Great Western]'s individual case-by-case approval. . . . The guidance line amount is $3,600,000.00.

Marlin Hupka, a vice president of both Great Western and its predecessor, provided the same explanation at trial.

**¶12** Great Western's explanation is inconsistent with the actual terms of the Agreement, which identifies Great Western as "Lender" and begins with an "Agreement to Make and Take Loan," stating:

> Subject to the terms and conditions set forth in this Agreement, *Lender agrees to make the Loans to Borrower*, each such Loan to be used by Borrower for the acquisition of a Lot and for subsequent construction by Borrower of Improvements thereon, and *Borrower agrees to accept such Loans from Lender* as hereinafter described.

(Emphasis added). The Agreement continues: "Lender will, from time to time, make Lot Specific Advances to Borrower *under the Loan* for the purchase of the Related Lot and construction of Improvements thereon." (Emphasis added). It was only after Great Western withdrew from the Agreement that it informed Borrower it considered the Agreement an "uncommitted credit facility" or described the Agreement as "not a commitment" but "a set of terms" by which to make future loans. To accept this explanation would render the language within the "Agreement to Make and Take Loan" meaningless. We decline to adopt such a construction. *See ELM Retirement*, 226 Ariz. at 291 ("In interpreting a contract, we do not construe one term in a way that renders another meaningless.").

¶13  Great Western relies upon language within the Agreement that "[t]he Loans are not a line of credit" and each lot-specific loan "is subject to Lender's individual, case-by-case approval and Borrower's satisfaction of all terms and conditions contained in this Agreement with respect thereto." These statements are not, however, dispositive of the issue before us because, within the Agreement, "Loans" is defined as "one or more of the Loans *which Lender agrees to make to Borrower pursuant to this Agreement*." (Emphasis added). The Agreement thus states only that the lot-specific loans were not a line of credit; it is silent as to whether the financing structure contemplated by the Agreement as a whole operated as a line of credit. The existence of a defined maximum amount which the Borrower could request certainly suggests otherwise.[5]

¶14  By requiring Borrower to follow a specified procedure and furnish additional information to obtain each lot-specific loan, the lending arrangement is distinguished from a traditional line of credit where a certain sum is available to the borrower as he deems appropriate without any further explanation to the lender or qualification by the borrower. But the fact that individual loans were "subject to the terms and conditions" set forth within the Agreement does not change Great Western's express agreement to "make loans" to Borrower upon its compliance with those terms, particularly in light of the agreed upon purpose of the arrangement "to insure that a lender will be available for construction financing." Additionally, that approval of individual lot-specific loans could be given without further input from the full lending committee, who had already signed off on the Agreement, suggests the process to obtain a lot-specific

---

[5]  A "line of credit" is "[t]he maximum amount of borrowing power extended to a borrower by a given lender, to be drawn on by the borrower as needed." Black's Law Dictionary (10th ed. 2014).

loan was more ministerial than substantive. Effectively, the Agreement was as much a loan agreement, i.e., a contract binding its signatories to the lending and borrowing of money, as any loan agreement ever written, notwithstanding Borrower's obligation to provide certain information to Great Western before it could make a draw.

¶15 Great Western argues that, as a matter of public policy, affirming the trial court's ruling "would discourage lenders from offering uncommitted loan facilities such as the Guidance Line, for fear that exercising their discretion to withdraw the same will result in a judgment against them." We are not persuaded that a sophisticated financial institution capable of lending monies on a scale allowing for the construction of residential subdivisions would be incapable of drafting a document evidencing an uncommitted loan facility in a manner that clearly and accurately describes the rights and obligations of the parties involved if it so intended. And if, as here, the financial institution introduces the term "guidance line" into the transaction, defines the term as a "line of credit" and "a commitment," and subsequently executes a "loan agreement" to memorialize the parties' rights and obligations, we find no offense in holding the financial institution to the terms of those instruments.

¶16 Further, to accept Great Western's position would place the court's imprimatur upon what has commonly been deemed an illusory contract. "[T]o agree to do something and to reserve the right to terminate the agreement at will is no agreement at all" — executory or otherwise. *Shattuck v. Precision-Toyota, Inc.*, 115 Ariz. 586, 588 (1977) ("[A]n illusory contract is unenforceable for lack of mutuality. . . . [A] contract must have mutuality of obligation, and an agreement which permits one party to withdraw at his pleasure is void.") (internal quotations omitted).

¶17 Here, both the language of the Agreement and its context reflect the parties' intent that it would operate, effectively, as a line of credit, subject to certain limitations and preconditions. We agree with Great Western that it was not committed to grant any particular request for a lot-specific loan; however, Great Western agreed to be available and was required under the terms of the Agreement to at least consider Borrower's requests on a case-by-case basis. As discussed below, the trial court acted well within its discretion in finding Great Western breached the Agreement by refusing to honor these terms.

II. **Viability of Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

¶18        Great Western next argues Appellees' claim for breach of the implied covenant of good faith and fair dealing is barred as a matter of law because it "relies on a promise to lend money *not evidenced in writing*," and therefore violates Arizona's statute of frauds and federal law.  The application of statutes presents a question of law which we review *de novo*. *See Gomez v. Maricopa Cnty.*, 175 Ariz. 469, 471 (App. 1993) (citing *Gary Outdoor Advert. Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242 (1982)).

¶19        Arizona's statute of frauds provides:

> No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged . . . Upon a contract, promise, undertaking or commitment to loan money or to grant or extend credit . . . involving both an amount greater than two hundred fifty thousand dollars and not made or extended primarily for personal, family or household purposes.

A.R.S. § 44-101(9).  Great Western also asserts the *D'Oench* doctrine likewise prohibits a borrower from asserting defenses or claims against a failed bank based upon unwritten agreements.[6]  *See* 12 U.S.C. § 1823(e)(1); *Adams*, 187 Ariz. at 589-90 (citing *D'Oench*, 315 U.S. at 457, and *Resolution Trust Corp. v. Foust*, 177 Ariz. 507, 517 (App. 1993)).

¶20        Great Western's reliance upon this authority is misplaced and appears to arise from its mischaracterization of the Agreement and the nature of the underlying claim.  Here, the claim for breach of the implied covenant of good faith and fair dealing is premised upon Great Western's

---

[6]        The *D'Oench* doctrine is a form of estoppel designed to protect the FDIC from fraudulent practices by "enabl[ing it] to enforce agreements between failed banks and their borrowers in strict accordance with the terms of the loan documents," and not an unwritten "secret agreement" between the borrower and a representative of a defunct financial institution.  *FDIC v. Adams*, 187 Ariz. 585, 590 (App. 1996) (citing *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 459-62 (1942)).

withdrawal from the Agreement, which is clearly evidenced in writing. As alleged here, it is not a tort claim[7] and is not based upon any oral or "secret" arrangement to extend the contract past its natural expiration of December 2008. Therefore, neither the statute of frauds, nor the *D'Oench* doctrine, has any application.

**¶21** The covenant of good faith and fair dealing is implied in every contract, including the Agreement at issue here, and can be breached even where the express terms are not violated. *Wells Fargo*, 201 Ariz. at 490, ¶ 59; *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424, ¶ 17 (App. 2002). Here, Appellees properly alleged Great Western acted in a manner that denied Borrower the reasonably anticipated benefit of the Agreement, *see Bike Fashion*, 202 Ariz. at 424-25, ¶¶ 17-18, when it unilaterally withdrew from that agreement, and Appellees were properly permitted to proceed upon that theory.[8]

## III. Evaluation of the Evidence

**¶22** The remainder of Great Western's arguments concern the sufficiency of evidence to support the findings of fact upon which the trial court's conclusions are based. We review the trial court's findings of fact for an abuse of discretion. *Myers v. W. Realty & Constr., Inc.*, 130 Ariz. 274, 277 (App. 1981) (citing *Lawrence v. Valley Nat'l Bank*, 12 Ariz. App. 51, 57

---

[7] Arizona recognizes a tort claim for breach of the implied covenant of good faith and fair dealing "but only where there is a 'special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility.'" *Wells Fargo Bank v. Ariz. Laborers Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 491, ¶ 60 (2002) (quoting *Burkons v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 345, 355 (1991)). Our courts have generally declined to recognize any special relationship between a debtor and creditor, *see McAlister v. Citibank*, 171 Ariz. 207, 212 (App. 1992) (holding bank owed no fiduciary duty to borrower); *cf. Stewart v. Phx. Nat'l Bank*, 49 Ariz. 34, 44 (1937) (finding special relationship between debtor and creditor existed only because bank officers and directors had been debtor's financial advisors for twenty-three years), and Appellees here do not allege otherwise.

[8] The trial court ruled before trial that Appellees, as guarantors, were entitled to pursue an offset for the amount of any of Borrower's claims against Great Western. *See* Restatement (First) of Security § 133 (1941) (cited favorably by *Great Am. Ins. v. Fred J. Gallagher Constr. Co.*, 16 Ariz. App. 479, 480-81 (1972)). Neither party challenges this ruling on appeal.

(1970)). Where there is conflicting evidence, we do not substitute our judgment for the trial court's and will reverse only where the findings are clearly erroneous. *Id.*; Ariz. R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."). We therefore review each contention to determine whether it is supported by substantial evidence in the record. *Visco v. Universal Refuse Removal Co.*, 11 Ariz. App. 73, 75 (1969) (citing *Bohmfalk v. Vaughan*, 89 Ariz. 33, 38 (1960), and *Reliable Elec. Co. v. Clinton Campbell Contractor, Inc.*, 10 Ariz. App. 371, 374 (1969)).

### A.     Termination of the Agreement

**¶23**         Great Western argues the trial court abused its discretion in finding Great Western breached the Agreement by unilaterally terminating its obligation to extend financing. Great Western does not dispute it withdrew from the Agreement, but argues instead it was within its discretion to do so. Whether a party has breached a contract is a question of fact. *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333, ¶ 28 (App. 2009) (citing *Wells Fargo*, 201 Ariz. at 493, ¶¶ 69-70).

**¶24**         The language of the Agreement authorizes termination only upon Borrower's default. It does not grant Great Western authority to unilaterally withdraw from the Agreement. Great Western did not assert Borrower had defaulted, and its termination of the Agreement was a direct violation of its written terms. By definition, Great Western's actions constitute a breach of contract, and we find no error.

### B.     Borrower's Ability to Perform

**¶25**         Great Western next argues the trial court erred in finding Borrower was capable of performing under the Agreement, a necessary precursor to its conclusion that Great Western committed anticipatory breach. *See Thomas v. Montelucia Villas, L.L.C.*, 232 Ariz. 92, 95, ¶ 9 (2013) (requiring the non-breaching party show "'that he would have been ready and willing to have performed the contract, if the repudiation had not occurred'" in order to recover damages for anticipatory repudiation) (quoting *United Cal. Bank*, 140 Ariz. at 288-89). Specifically, Great Western contends that because Borrower had yet to obtain permits for any vertical construction or to construct an access road required by the City of Flagstaff, it "was never in a position to build" and was therefore unable to perform.

**¶26**         The trial court's finding that Borrower had the ability to perform its obligations when Great Western breached the Agreement is

supported by the record. Great Western withdrew from the Agreement in early July 2008. It is uncontested that Borrower was current on its payments for the A&D Loan at least through October 2008. The court was advised that Great Western's own construction inspection, undertaken in August 2008, rated Borrower's progress as "acceptable." In fact, prior to being notified of Great Western's repudiation of the contract, Borrower had planned to start obtaining building permits toward vertical construction that same month.

¶27 Great Western points to evidence that the preconditions to financing were not actually completed until after the Agreement would have expired. That the project was ultimately delayed when Borrower purposefully slowed construction in an effort to conserve funds while it searched for alternate financing does not conclusively establish Borrower was unable to perform at the time of Great Western's breach; "the law does not require the nonbreaching party to do a futile or useless act." *United Cal. Bank*, 140 Ariz. at 283 (citing *Kammert Bros. Enters., Inc. v. Tanque Verde Plaza Co.*, 102 Ariz. 301, 306 (1967), and *Lee v. Nichols*, 81 Ariz. 106, 111-12 (1956)). And, Borrower still had six months before the Agreement expired to complete any infrastructure required prior to requesting lot-specific loans. *See Kammert Bros.*, 102 Ariz. at 306 (noting a party generally has the right to perform at any time during the contract period). Additionally, any purported concern over Borrower's ability to perform is belied by the testimony of Great Western's vice president, Hupka, who, within the purview of his task "to manage the risk" for Great Western in its Arizona market, recommended reinstating the Agreement and extending additional loans to Borrower immediately post-repudiation and through mid-2009, believing "[l]ong term, . . . [Borrower] has a good product and location for the project and should be able to sell enough homes to settle the debt."

¶28 In light of the conflicting evidence, the trial court acted within its discretion in concluding Borrower was able to perform at the time of Great Western's breach.

## C. Extension of the Agreement

¶29 Great Western argues the trial court erred in finding it would "[m]ore probably than not" have extended the Agreement beyond its stated term. Great Western contends this finding is merely speculative and untenable in light of Arizona's statute of frauds, which prohibits an oral contract for the extension, renewal, or modification of a loan. *See* A.R.S. § 44-101(9). However, the finding does not "suggest[] there was an oral agreement or understanding that such an extension would have been

11

granted" as Great Western contends; rather, it reflects the court's resolution of the factual issue of what, more probably than not, would have occurred in the absence of a breach. This fact is relevant to calculating the extent of Borrower's damages and properly within the scope of the findings required of the trial court. *See Miller v. Bd. of Supervisors of Pinal Cnty.*, 175 Ariz. 296, 299 (1993) (noting findings of fact required under Rule 52(a) must be sufficiently specific and address all pertinent issues).

¶30        The finding is also supported by the evidence. Great Western acknowledged the opportunity existed to extend the Agreement if it made business sense to do so. Market reports indicated the Cedar Ridge development would be successful and profitable and would allow Borrower to repay its obligations to Great Western. Hupka testified that, if the development was building and selling homes, "[i]t would make business sense" to extend the Agreement, and he actively encouraged Great Western to reinstate the Agreement or offer alternate financing to construct model homes at Cedar Ridge, even after the Agreement would have otherwise expired by its own terms in December 2008. From this evidence, the trial court could reasonably conclude Great Western would have continued its arrangement with Borrower.

### D.        Breach of Implied Covenant of Good Faith and Fair Dealing

¶31        Great Western argues the trial court abused its discretion in finding it breached the implied covenant of good faith and fair dealing by withdrawing from the Agreement because Borrower could not have had a reasonable expectation it would receive funding from Great Western in the absence of a binding obligation to make loans.[9] *See Bike Fashion,* 202 Ariz. at 423, ¶ 13 (noting the "basic purpose" of contract law and the implied covenant of good faith and fair dealing is to protect the parties' reasonable expectations) (citing 3A Corbin on Contracts § 654 (Lawrence A. Cunningham & Arthur J. Jacobson eds., Supp. 1999)). "Issues of reasonableness are generally questions of fact." *In re Estate of Jung*, 210 Ariz. 202, 207, ¶ 28 (App. 2005) (citing *Trustmark Ins. v. Bank One, Ariz., N.A.*, 202 Ariz. 535, 541, ¶ 25 (App. 2002)).

---

[9]        Although not expressly contained in the record, we presume the trial court made all findings necessary to sustain the judgment if they are "reasonably supported by the evidence, and not in conflict with the [court's] express findings." *Coronado Co. v. Jacome's Dep't Store, Inc.*, 129 Ariz. 137, 139 (App. 1981).

¶32        To accept this argument requires us to accept Great Western's overarching premise that when it wrote the Agreement, it did not do so for the purpose of memorializing an agreement to loan money — a position belied by the specific language of the Agreement and one which we have rejected. *See* Part I *supra*. Contrary to Great Western's assertions otherwise, that Borrower was unable to obtain alternate financing does not illustrate Great Western's decision to terminate the agreement to provide financing was made in good faith. Indeed, by unilaterally terminating the Agreement six months before it was to expire and depriving Borrower of the ability to construct homes within the development, Great Western stripped Borrower of the precise benefit for which it contracted and violated the covenant of good faith and fair dealing.

¶33        We likewise reject Great Western's suggestions that: (1) it acted in a commercially reasonable manner and with Borrower's best interest in mind when it terminated the Agreement given the declining economic conditions and its general concerns regarding the success of then-existing real estate development projects, and (2) it was authorized to terminate the Agreement at its pleasure so long as it had a good faith intention, at the time of execution, to make loans to Borrower. Beyond being both an incorrect statement of the law, *see Wells Fargo*, 201 Ariz. at 490, ¶ 59 (stating the "implied covenant of good faith and fair dealing prohibits a party from doing *anything* to prevent other parties to the contract from receiving the benefits and entitlements of the agreement," without limiting the obligation to execution of the contract) (emphasis added), and contrary to the specific language of the agreement, these claims were raised in this Court for the first time at oral argument and were thus waived, *see Santa Fe Ridge Homeowners' Ass'n v. Bartschi*, 219 Ariz. 391, 398 n.3, ¶ 22 (App. 2008) (citing *Mitchell v. Gamble*, 207 Ariz. 364, 369-70, ¶ 16 (App. 2004)).

¶34        Alternatively, Great Western argued at oral argument that since it had decided not to loan Borrower the contracted-for monies, it was more efficient to repudiate the entire contract at once rather than process, and reject, applications for funding as they were received. In doing so, Great Western conflates the issue of whether it would have approved a lot-specific loan request with that actually presented here — its obligation to consider requests for funding on a case-by-case basis. The Agreement specified it was effective until December 2008, and the only basis for termination was an event of default by Borrower. Hupka agreed it would be reasonable for Borrower to expect the Agreement to continue until at least the stated expiration date. That Borrower had not yet requested a loan under the Agreement is irrelevant; it had an additional six months,

13

according to the express terms of the contract, to do so. Great Western's arguments that Borrower would not have satisfied the preconditions to approval are rejected for the same reasons set forth in Part III(B), *supra*. And, it can reasonably be inferred, based upon Hupka's personal and repeated requests to Great Western to either reinstate the Agreement or issue new loans to Borrower, that, had Borrower submitted one or more loan requests, they would have been approved by Great Western had it dealt with Borrower in good faith.

¶35        In sum, substantial evidence supports the trial court's implicit finding that Borrower reasonably expected Great Western to provide construction financing and its conclusion that Great Western's failure to do so violated the implied covenant of good faith and fair dealing.

### E.        Lost Profits

¶36        Finally, Great Western contends Appellees failed to establish with reasonable certainty that Borrower lost profits of $2.8 to $3.5 million as a result of Great Western's breach of the Agreement. Generally, the non-breaching party to a loan agreement is entitled to recover an amount that will reasonably and fairly compensate him for losses resulting from the breach — the amount that would place him in the same position in which he would have been had the contract been performed. *See Higgins v. Ariz. Sav. & Loan Ass'n*, 90 Ariz. 55, 63-64 (1961) (noting where one party has broken a contract, damages may amount to what "'may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract'") (quoting *Shurtleff v. Occidental Bldg. & Loan Ass'n*, 181 N.W. 374, 376 (Neb. 1921)); Rev. Ariz. Jury Instr. (Civil) Contract 17 (5th ed. 2013). Both the existence and amount of lost profits present questions of fact which must be proven with reasonable certainty. *See Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 67 (1968); *Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*, 10 Ariz. App. 445, 450 (1969).

¶37        Regarding lost profits, the trial court concluded:

> Had [Great Western] not breached, after payment of the A&D loan, Borrower would have realized an estimated net profit in the range of $2,808,000 to $3,500,000. The Court concludes that the 50 homes would have sold eventually. At a minimum, Borrower would have been able to sell approximately half of the homes based on the original projection of $70,000 net profit per home and the remainder for at least the revised projection of $42,320 net profit per

home.    More likely, with Borrower's ability to reduce construction costs to lower price, profits would have been on the higher end of that range.

¶38        Great Western first argues the award of lost profits was inappropriate because, it contends, the loss was more likely caused by a declining economy rather than breach of the Agreement.  Although this is a possible explanation, it is one which the trial court rejected in favor of evidence from Great Western's own appraiser that home sales in Flagstaff remained largely consistent through 2009.  The record also reflects that demand for housing in Flagstaff was significant given the limited availability of land in the area and the lower-cost housing proposed for Cedar Ridge would fill an underserved niche in the community even in the down economy.  Great Western's appraiser also concluded Borrower would have been able to sell at least one home per month in 2009 which would have been sufficient to service the loans with Great Western.  And, even if Great Western had decided not to extend the Agreement beyond its expiration in December 2008, Borrower would have been able to build several model homes in the meantime and enhance its chances of obtaining alternate financing, thereby mitigating its damages.

¶39        We will not second-guess the trial court's resolution of disputed questions of fact where its findings are supported by the record. *See Gen. Elec. Capital Corp. v. Osterkamp*, 172 Ariz. 185, 188 (App. 1992) (citing *City of Phx. v. Geyler*, 144 Ariz. 323, 329 (1985)).  We will certainly not do so where the findings of the court were based upon the testimony of the objecting party's own witnesses.

¶40        Great Western also disputes the trial court's calculation of lost profits, arguing: (1) Appellees did not prove Great Western would have extended the Agreement past its expiration, and therefore, damages should have been calculated based only upon the number of homes Borrower could have built between July and December 2008, and (2) Appellees did not present sufficient evidence for the court to determine how many homes Borrower would have constructed between July and December 2008.  It contends the court's conclusion is "wildly speculative," and that using the words "eventually" and "more likely" "emphasize[s] the *un*certainty of the situation."[10]

―――――――――――――

[10]        Great Western also takes issue with the trial court's use of the words "would have."  We are unable to discern any meaning from the phrase

¶41      This position is untenable in light of the trial court's factual findings, as supported by the record and affirmed in ¶¶ 29-30, 38-39, *supra*, that Borrower would have been able to sell the homes at a profit in the favorable Flagstaff market, and Great Western would have acted in its own best interest by continuing the financing arrangement through to completion of the project.  Moreover, we have long-recognized that absolute certainty in the amount of damages is not necessary where the fact of damage is proven, with doubts to be resolved in favor of the non-breaching party.  *See Gilmore v. Cohen*, 95 Ariz. 34, 36 (1963) (citing *Story Parchment Co. v. Patterson Parchment Paper Co.*, 272 U.S. 555, 563-64 (1931); *Grummel v. Hollenstein*, 90 Ariz. 356, 360 (1962); and *Brear v. Klinker Sand & Gravel Co.*, 374 P.2d 370, 374 (Wash. 1962)); Restatement (Second) of Contracts § 352 (1981) ("Doubts are generally resolved against the party in breach.  A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred.").  Reasonable certainty is therefore provided where there is "some reasonable method of computing [the] net loss."  *Lininger v. Dine Out Corp.*, 131 Ariz. 160, 163 (App. 1981) (citing *Irish v. Mountain States Tel. & Tel. Co.*, 500 P.2d 151, 154 (Colo. App. 1972)); *see also Gilmore*, 95 Ariz. at 36 ("[T]he evidence must make an 'approximately accurate estimate' possible.") (quoting *Martin v. LaFon*, 55 Ariz. 196, 199-200 (1940)).

¶42      Again, although there was conflicting evidence presented at trial as to these issues, we defer to the trial court's superior position to weigh the evidence, make credibility determinations, and resolve conflicts in facts and expert opinions.  *In re Estate of Pouser*, 193 Ariz. 574, 579, ¶ 13 (1999).  After making relevant findings of fact, the court articulated a formula, the use of which Great Western does not dispute, that makes an "approximately accurate estimate" of the lost profits.[11]  Nothing more is required.

---

other than an affirmative declaration that the events described would, in fact, have occurred absent Great Western's breach.

[11]      To reach the lower end of the range, the trial court added twenty-five homes multiplied by an anticipated profit of $70,000, to twenty-five homes multiplied by an anticipated profit of $42,320, for a total of $2,807,900.  To reach the higher end of the range, the court multiplied fifty homes by an anticipated profit of $70,000, for a total of $3,500,000.

## CONCLUSION

¶43     The judgment of the trial court is affirmed.

¶44     Both parties request an award of attorneys' fees on appeal pursuant to the terms of the A&D Loan and A.R.S. § 12-341.01.  As the prevailing party, Appellees are awarded their reasonable attorneys' fees and costs incurred on appeal upon compliance with ARCAP 21(b).



Ruth A. Willingham · Clerk of the Court
FILED: ama